IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Civil No. 4:24-cv-421 |
| Plaintiff, ) | |
| ) | |
| v. ) | VERIFIED COMPLAINT FOR |
| ) | FORFEITURE IN REM |
| APPROXIMATELY $38,501 AND ) | |
| $5,580, MORE OR LESS, SEIZED ) | |
| IN CONNECTION WITH A ) | |
| CONSPIRACY TO DISTRIBUTE ) | |
| COCAINE AND OTHER DRUGS, ) | |
| ) | |
| Defendants. ) | |

Plaintiff, United States of America hereby files and serves this VERIFIED COMPLAINT IN REM and alleges as follows:

## I.   NATURE OF THE ACTION

1. This is an action to forfeit and condemn specific property (hereinafter the "Defendant Property") to the use and benefit of the United States of America (hereinafter "Plaintiff") for its involvement, as set forth below, in violations of 21 U.S.C. §§ 846 (Attempt and conspiracy), 841(a)(1) (Prohibited acts), and 856 (Maintaining drug-involved premises).

2. The United States believes the Defendant Property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6), as money or a thing of value furnished or intended to be furnished by a person in exchange for a controlled substance, in violation of subchapter I – Control and Enforcement, of Chapter 13 – Drug Abuse Prevention and Control, and Title 21 – Food and Drugs, of the United States Code,

and as proceeds traceable to such an exchange, and as money used or intended to be used to facilitate any violation of said subchapter.

3. It is believed that evidence will show, after a reasonable opportunity for further investigation and discovery, that the Defendant Property constitutes the proceeds of a prohibited controlled substance offense or was used or intended to be used to facilitate a prohibited controlled substance offense and is therefore forfeitable.

## II. DEFENDANT IN REM

4. The Defendant Property is generally described as follows:

   a. Approximately $38,501, more or less, seized in the Southern District of Iowa by law enforcement from Thiat Van Deo and Chantelle Hastings on December 11, 2019; and

   b. Approximately $5,580, more or less, seized in the Southern District of Iowa by law enforcement from Thomas Criswell on December 11, 2019.

(hereinafter collectively referred to as "Defendant Property.") The Defendant Property is currently in the custody of local law enforcement.

## III. JURISDICTION AND VENUE

5. This Court has jurisdiction over this case, pursuant to 28 U.S.C. § 1345 (United States as Plaintiff), as an action commenced by the United States of America, and pursuant to 28 U.S.C. § 1355(a) (Fine, penalty, or forfeiture), as an action for forfeiture.

6. This Court has in rem jurisdiction and venue over the Defendant Property under 28 U.S.C. §§ 1355(b) and 1395(b) as the acts or omissions giving rise

to the forfeiture occurred in this district and because the Defendant Property was seized from and is located in this district.

## IV. FACTS

### A. Background Information

7. The "Controlled Substances Act" was enacted by Congress as Title II of the "Comprehensive Drug Abuse Prevention and Control Act of 1970," Pub.L. No. 91-513, 84 Stat. 1236 (1970) (codified at 21 U.S.C. §§ 801-904).

8. The term "controlled substance" is defined in 21 U.S.C. § 802(6) to mean a drug or other substance, or immediate precursor, included in any of the five schedules of such substances set forth in subchapter I of Title 21.

9. Schedule I substances have a high potential for abuse, have no currently accepted medical use in treatment in the United States, and there is a lack of accepted safety for use of these controlled substances under medical supervision. 21 U.S.C. § 812(b)(1)(A)-(C).

10. Marijuana and tetrahydrocannabinols, commonly known as "THC", are Schedule I controlled substances under the Controlled Substances Act.

11. Schedule II substances have a high potential for abuse, the controlled substances have a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions, but use of a Schedule II controlled substance may lead to severe psychological or physical dependence. 21 U.S.C. § 812(b)(2)(A)-(C).

12. Cocaine is a Schedule II controlled substance under the Controlled Substances Act.

13. Only persons registered by the Attorney General of the United States, in accordance with rules and regulations promulgated by the Attorney General, may legally manufacture or distribute controlled substances. 21 U.S.C. § 822(a) and (b).

14. Under the Controlled Substances Act, it is unlawful for a person to distribute, dispense, or possess with intent to distribute, a controlled substance, unless authorized by law to do so. 21 U.S.C. § 841(a)(1).

15. Under the Controlled Substances Act it is unlawful to conspire with others to violate its prohibitions. 21 U.S.C. § 846.

16. Under the Controlled Substances Act it is unlawful for a person to maintain any place for the purpose of distributing or using a controlled substance. 21 U.S.C. § 856(a)(1).

17. Under the Controlled Substances Act, all moneys or things of value furnished or intended to be furnished by any person in an illegal exchange for a controlled substance, all proceeds traceable to such an exchange, and all moneys used or intended to be used to facilitate a violation of Subchapter I of the Controlled Substances Act, are subject to forfeiture to the United States and no property right shall exist in such property.

18. The Defendant Property was involved in a conspiracy to distribute cocaine, marijuana, and THC in the Southern District of Iowa and elsewhere in approximately 2019.

19. Members of the conspiracy included Zachary Taylor Smith (hereinafter "SMITH"), Thiat Van Deo, also known as "Ted", (hereinafter "DEO"), Chantelle Crystal Lee Hayes (hereinafter "HAYES"), Thomas Criswell (hereinafter "CRISWELL"), and others.

20. None of the members of the conspiracy were authorized by law to distribute controlled substances.

### B. General Information About Drug Traffickers

21. Law enforcement officers who specialize in investigating drug crimes generally know the following, based on this their training and experience:

   a. Drug traffickers often use various locations to serve different functions in their business so that customers, thieves, and law enforcement personnel do not learn about any one location where they keep controlled substances, drug proceeds, and/or other drug-related assets, including firearms. Therefore, one or more locations are often used to store controlled substances, drug proceeds, packaging materials and tools, and/or drug-related assets, commonly referred to as "stash houses", and other locations are used to meet customers.

   b. Drug trafficking is largely a cash business, because drug traffickers seek to avoid detection by keeping their profits in cash to avoid having their drug profits raise the suspicions of employees of a financial institution and to avoid having their drug-related deposits and withdrawals documented in bank records that can be obtained by law enforcement;

   c. Many drug traffickers, concerned about detection by law enforcement if they deposit their drug proceeds in a financial institution, maintain the drug proceeds in cash on their person, in numerous locations used as money "stash" locations, or conceal the narcotics proceeds in hidden compartments located in residences, other locations, or vehicles; and

   d. Drug traffickers often carry on their person, or maintain in their residences, garages and outbuildings, businesses, and

conveyances, firearms, destructive devices, ballistic body armor, or other dangerous weapons to deter customers, thieves, and law enforcement personnel from stealing or seizing their drugs and narcotics proceeds.

### C. United States v. Smith

22. On June 17, 2021, SMITH waived Indictment and was charged by Information in the U.S. District Court for the Southern District of Iowa with conspiracy to distribute at least 5 kilograms of cocaine. The Information alleged SMITH had approximately $179,914 in drug proceeds seized from him that should be forfeited. *United States v. Smith,* No. 4:21-CR-084 (S.D. Iowa) (R. Doc. 5.)

23. On June 18, 2021, SMITH entered into a Plea Agreement (R. Doc. 14) and pled guilty. He agreed to forfeit the $179,914 in drug money, which was forfeited from him. (R. Doc. 30.)

24. SMITH was sentenced on October 20, 2021, to 32 months in federal prison. (R. Doc. 32.)

### D. Search of SMITH's Residence

25. On November 7, 2019, SMITH went into a UPS Store in Clive, Iowa, and accepted delivery of two packages sent to him containing THC pens and THC edibles.

26. He conspired with others to obtain and distribute the THC, and derived profit from doing so.

27. Later that day, law enforcement obtained a search warrant for SMITH's residence in Waukee, Iowa.

28. Inside SMITH's residence, law enforcement found the following evidence of drug dealing:

6

   a. a UPS package shipped to SMITH from California containing thirty (30) THC cartridges;

   b. a working scale with cocaine residue;

   c. four (4) empty steroid boxes;

   d. a Tupperware container containing a digital scale with cocaine residue, a cocaine grinder; and several plastic baggies consistent with drug dealing;

   e. three (3) plastic containers with approximately 459 grams of cocaine;

   f. $179,540 in U.S. Currency in a black safe, inside a bedroom closet;

   g. numerous bottles of steroids and steroid packaging;

   h. another digital scale, inside a red tool chest;

   i. several fake identification cards from various states with SMITH's photograph; and

   j. $374 in U.S. Currency.

29. SMITH derived the seized money from conspiring with others to sell controlled substances, including, but not limited to, THC and cocaine.

### E. SMITH's Post-*Miranda* Interview

30. Law enforcement read SMITH his *Miranda* rights. He acknowledged he understood them and agreed to be interviewed.

31. SMITH said he possessed between three hundred (300) and four hundred (400) grams of cocaine in his residence.

32. SMITH said the cocaine he had was left over from a kilogram of cocaine he had recently obtained but he had sold much of it already.

33. SMITH described the cocaine he was selling as "pure, uncut and straight from the jungle."

34. SMITH said he was at the top of the local drug distribution organization in which he was involved.

35. SMITH said an Asian guy named "Ted" was his partner and travelled to other states to acquire cocaine for them to sell.

36. "Ted" is Thiat Van DEO.

37. SMITH said he had been selling cocaine for approximately a year.

38. SMITH said he started out as a cocaine user, and then became enticed by how much money he thought he could make selling cocaine.

39. SMITH said he eventually started meeting people who had cocaine for sale, including kilograms of cocaine.

40. SMITH said most of the people he knew with kilograms of cocaine for sale were "upper class white guys who have money."

41. SMITH said he was eventually introduced into an Asian and Bosnian circle of cocaine connections, which included DEO.

42. SMITH said DEO had been selling cocaine most of his adult life.

43. SMITH said DEO didn't have enough money to purchase kilogram quantities of cocaine, but he did, so they started out splitting a kilogram of cocaine to sell to others.

44. SMITH said he and DEO eventually decided to start buying as much cocaine as they could, including from a source in Kansas City, who was their most recent source.

45. SMITH said he started out buying ounces of cocaine for $1,500 apiece from his source, which sold very quickly because he had an established network of customers, and he was selling good quality cocaine.

46. SMITH said he put up the money and DEO did all the driving with the cocaine.

47. SMITH said DEO's girlfriend, HAYES, at times rode with DEO when he traveled to Kansas City to pick up cocaine.

48. SMITH said DEO typically delivered the cocaine from Kansas City directly to SMITH's residence or held onto it until SMITH could pick it up.

49. SMITH confessed that he and DEO had been moving approximately one (1) to two (2) kilograms of cocaine per month for the prior six (6) to eight (8) months.

50. SMITH accused DEO of owing him approximately $15,000 for cocaine and THC products DEO had previously accepted.

51. SMITH said he typically divided the cocaine up into "balls" (3.5 grams) after he received it from DEO and stored it in plastic containers until his customers were ready.

52. DEO typically distributed his share of the cocaine over seven (7) to ten (10) days, then collected the cash proceeds, and brought the money over to SMITH's to be "stockpiled."

53. When SMITH and DEO were ready to buy more cocaine, DEO would often come over to SMITH's residence, pick up the cash (approximately $44,000) and make another trip to Kansas City with it to buy more cocaine.

54. SMITH said DEO also obtained cocaine from a source in Minneapolis, but he believes the Minneapolis source is connected to the Kansas City source.

55. SMITH kept track of the drug debts he was owed in the "notes" section if his cell phone.

56. SMITH identified numerous cocaine customers.

57. SMITH also dealt steroids to numerous people.

### F. Search of DEO's Residence

58. On December 11, 2019, law enforcement officers executed a search warrant at DEO's residence in Carlisle, Iowa.

59. DEO then lived with HAYES.

60. Both DEO and HAYES were home at the time the warrant was executed.

61. Law enforcement found the following evidence of drug dealing in the residence:

   a. numerous THC vape pens throughout the residence;

   b. a plastic baggie in HAYES' purse with a gram of cocaine;

   c. approximately $81 in cash in HAYES' purse;

   d. two (2) baggies of cocaine (5 grams each) in a blue coat;

   e. $120 in cash in a nightstand;

    f. $6,000 in cash in a backpack;

    g. plastic baggies used for drug packaging in the same backpack;

    h. numerous other plastic baggies used for, or intended to be used for, packaging drugs;

    i. a baggie with a one-quarter (1/4) ounce of cocaine in the same backpack;

    j. $32,300 in a safe;

    k. a baggie with a half (1/2) gram of cocaine in the same safe;

    l. two (2) working scales, and cocaine-related paraphernalia inside the same safe;

    m. a plastic baggie with two (2) grams of cocaine inside a coat;

    n. a plastic baggie with one (1) gram of cocaine inside a black vest;

    o. a Glock 43, 9 mm handgun (SN ZHH574), two loose magazines, and loose ammunition;

    p. a baggie with one (1) gram of cocaine inside a pocket of some blue jeans;

    q. three (3) metal containers of cocaine residue in a women's leather coat;

    r. three (3) plastic baggies containing a half (1/2) gram of cocaine, in a yellow purse inside a vehicle;

    s. a working digital scale inside DEO's Mercedes Benz vehicle;

    t. a plastic baggie with cocaine residue in DEO's Mercedes-Benz.

62. The drugs, scales, packaging material, and money are all evidence that DEO was part of an illegal conspiracy to distribute cocaine and THC.

## G. DEO's Post-*Miranda* Interview

63. Law enforcement read DEO his *Miranda* rights. He acknowledged he understood them and agreed to be interviewed.

64. DEO said he thought law enforcement searched his residence related to "weed and coke."

65. DEO acknowledged he had "maybe 20 thousand" in his safe, as well as a loaded firearm.

66. DEO also admitted he had $6,000 cash in his backpack.

67. DEO said he typically kept his drugs in the safe, in the backpack, or in the trunk of his Mercedes-Benz.

68. DEO admitted he had cocaine in the safe.

69. DEO also made admissions about his illegal dealing of marijuana and marijuana-related items.

70. DEO said he typically obtained the cocaine he sold from a "guy up north," meaning St. Paul, Minnesota.

71. DEO said he typically met "the guy up north" somewhere near Story City or Nevada to obtain cocaine.

72. DEO said he typically obtained half (1/2) kilo or full kilo (1,000 grams) of cocaine from "the guy up north."

73. "The guy up north" charged DEO $18,000 for a quarter (1/4) kilogram of cocaine, $30,000 for a half (1/2) kilogram, and around $50,000 - $55,000 for a full kilogram.

74. DEO said he had been getting cocaine from "the guy up north" for approximately four (4) to five (5) years.

75. DEO said after he obtained the cocaine, he typically took it to a friend's house to split up.

76. DEO charges his customers $100 more per ounce than what he paid for the cocaine, as his profit margin.

77. DEO named numerous people involved with him in cocaine trafficking, including SMITH.

78. DEO said SMITH held their cocaine money, and then DEO picked it up and delivered what was owed to "the guy up north", who he knew as "SHORTY."

79. Once SHORTY was paid, DEO got more cocaine from him, brought it back to SMITH, and they divided it up to sell.

80. DEO identified another person involved in their cocaine network was Thomas Criswell (hereinafter "CRISWELL").

81. DEO admitted all of the cash seized from his residence was either proceeds from drug trafficking or was to be used to buy more drugs.

### H. HAYES' Post-*Miranda* Interview

82. Law enforcement read HAYES her *Miranda* rights. She acknowledged she understood them and agreed to be interviewed.

83. HAYES confirmed she made trips to Kansas City with DEO to pick up cocaine, and she sometimes used her car to do so. At times she stored DEO's cocaine in her purse.

84.   HAYES was aware DEO usually dropped cocaine from Kansas City off at SMITH's residence, and the residence of another member of the conspiracy, S.L.

85.   Neither DEO nor HAYES have made claim for the return of the drug money seized from their residence.

### I. Search of CRISWELL's Residence

86.   Through surveillance and other methods, law enforcement developed information that CRISWELL's residence was, at times, used to stash drug money associated with the conspiracy.

87.   CRISWELL has a long history of being involved in drug trafficking, as noted by the following criminal history:

   a. a 1983 arrest by Polk County Sheriff's Office for Possession of a Controlled Substance resulting in a misdemeanor conviction;

   b. a 1984 arrest by Windsor Heights PD for False Info/Possession of a Controlled Substance resulting in a misdemeanor conviction;

   c. a 1994 arrest by Urbandale PD for Possession Schedule II with Intent to Deliver resulting in a felony conviction;

   d. a 1995 arrest by Des Moines PD for Possession of a Schedule II Controlled Substance resulting in a felony conviction;

   e. a 2004 arrest by Des Moines PD for a Controlled Substance Violation and No Drug Tax Stamp resulting in felony convictions; and

   f. a 2004 arrest by Des Moines PD for a Controlled Substance Violation resulting in a felony conviction.

88.   On December 11, 2019, law enforcement executed a federal search warrant at CRISWELL's residence in Des Moines, Iowa.

89. During the search of CRISWELL's residence, law enforcement found the following evidence of drug trafficking:

   a. a digital scale with drug residue;

   b. plastic heat seal packaging;

   c. a cigarette box with five (5) individually wrapped baggies of cocaine;

   d. various bags of marijuana and marijuana-related items;

   e. $5,000 hidden inside a speaker;

   f. $580 in U.S. Currency in CRISWELL's pocket;

   g. a baggie with one (1) gram of cocaine in CRISWELL's pants pocket;

   h. another package with an estimated half (1/2) gram of cocaine, also in CRISWELL's pants pocket; and

   i. a red notebook with drug notes.

90. The drugs, scale, notes, and currency are all evidence that CRISWELL was involved in drug dealing.

### J. CRISWELL's Post-*Miranda* Interview

91. Law enforcement read CRISWELL his Miranda rights. He acknowledged he understood them and agreed to be interviewed by law enforcement.

92. CRISWELL admitted he had marijuana and cocaine in the residence.

93. CRISWELL admitted he had "a couple thousand dollars" hidden in a speaker, as well as a few hundred more dollars.

94. CRISWELL denied that the funds were drug proceeds.

95. When CRISWELL asked if he had ever sold cocaine, he replied, "I can't say it's never happened."

96. CRISWELL also admitted he had conversations with his cell phone about drugs.

97. CRISWELL said "I'm trying to be as honest as possible . . .without . . . like . . . signing my own . . . without incriminating me . . . "

98. CRISWELL later said, "I'm not certain . . . the other locations . . . but . . . obviously I know somebody that is the object of your investigation."

99. CRISWELL was asked to provide the name of his cocaine source and declined.

100. CRISWELL has not made a claim or request to law enforcement for the return of the money seized from his residence.

## V.  COUNT ONE
### (FORFEITURE UNDER 21 U.S.C. § 881(a)(6))

101. Plaintiff repeats and realleges each and every allegation set forth above.

102. The United States has reason to believe the Defendant Property constitutes moneys or other things of value furnished or intended to be furnished in exchange for a controlled substance, and/or were used or intended to be used to facilitate one or more violations of 21 U.S.C. §§ 841, 843, and 846 et seq.

103. As a result of the foregoing, the Defendant Property is liable to condemnation and to forfeiture to the United States for its use, in accordance with 21 U.S.C. § 881(a)(6).

## VI. CONCLUSION

WHEREFORE, the Plaintiff requests that the Court issue a warrant and summons for the arrest and seizure of the Defendant Property; that notice of this action be given to all persons known or thought to have an interest in or right against the property; that the Defendant Property be forfeited to the United States; and that the United States be awarded its costs and disbursements in this action, and such other and further relief as the Court deems proper and just under the facts and applicable law.

Respectfully submitted,

Richard D. Westphal
United States Attorney

By: */s/Craig Peyton Gaumer*
Craig Peyton Gaumer
Assistant United States Attorney
U. S. Attorney's Office
210 Walnut Street, Suite 455
Des Moines, Iowa 50309
Tel: (515) 473-9300
Fax: (515) 473-9292
Email: craig.gaumer@usdoj.gov

## VERIFICATION

I, John Scarlett, hereby verify and declare under penalty of perjury that I am a Senior Police Officer/ Vice and Narcotics Investigator with the City of Des Moines Police Department (hereinafter "DMPD"), and that I have read the foregoing Verified Complaint and know the contents thereof. I verify and declare that the matters contained in the Verified Complaint are true to my own knowledge, except for those matters not within my own personal knowledge and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds for my belief are the official files and records of the DMPD, as well as information provided to me by other law enforcement officers, as well as my investigation of this case.

Dated: December 2, 2024.

_____  #4937
John Scarlett, Senior Police Officer
Vice and Narcotics Investigator
City of Des Moines Police Department